UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,                            Case No. 1:10-CR-206

v.                                       Hon. ROBERT HOLMES BELL

JOHN MAURICE STEPHENSON,

           Defendant.

_____/

### OPINION

Pending before the court is a motion filed by the U.S. Attorney's Office on recommendation of the Federal Medical Center in Butner (FMC or Butner), North Carolina, to allow the FMC to forcibly medicate defendant to restore him to competency to stand trial (docket no. 31). Defendant opposes the motion. For the reasons discussed, the motion will be **DENIED.**

### Procedural Background

Defendant was initially charged in a complaint filed on June 22, 2010, with being a felon in possession of ammunition and body armor. The charges grew out of interviews with the defendant on April 23, 2010 and June 4, 2010 by Secret Service and FBI agents regarding threats defendant had allegedly made against President Obama, defendant's ties to a militia group, and large quantities of ammunition in this home. These interviews were conducted in anticipation of a visit to Kalamazoo, Michigan, by the President on June 7, 2010. The agents were also concerned that defendant had been sentenced to prison for 3 - 5 years in 1998 for being an accessory after the fact

1

to murder.  However, the ammunition in defendant's home was not seized until June 18, 2010, nor defendant arrested until July 7, 2010.  There were no guns in the home.

On July 9, 2010, defendant moved that both his competence to stand trial and his mental responsibility for the alleged offense be evaluated pursuant to 18 U.S.C. §§ 4241 and 4242, respectively.  Noting that defendant, among other things, had been found mentally incompetent for trial proceedings on two earlier occasions, and that his condition had been previously relieved to some extent by the use of anti-psychotic medication, the court granted the motion. Order of Commitment for Mental Examination, July 9, 2010.  Defendant was sent for evaluation to the Psychology Services Department, Metropolitan Correctional Center (MCC), in Chicago, Illinois.

While at the MCC, defendant was indicted in this court on one count of being a felon in possession of ammunition a Class C  felony carrying a maximum prison sentence of ten years. The body armor charge was dropped.  The case was assigned to a district judge, who informally requested the undersigned continue to handle the competency proceeding which was already underway.

On December 14, 2010, the court conducted an evidentiary hearing pursuant to 18 U.S.C. § 4247(d).   At the hearing, the court considered psychological report prepared by Ron J. Niederding, PhD, a forensic psychologist at the MCC, and heard testimony from the doctor as well, who concluded that defendant suffered from a mental disorder known as Delusional Disorder, which significantly impaired his rational understanding and his ability to assist counsel.  All of this evidence was uncontroverted, and the court found defendant was not competent to stand trial. Order of Commitment, December 14, 2010.

Defendant was sent to the Federal Medical Center at Butner for treatment for a reasonable period of time to determine whether there was a substantial probability that in the foreseeable future the defendant would attain the capacity to permit the proceedings to go forward. 18 U.S.C. § 4241(d)(1).

To date, treatment has been unsuccessful.  Defendant has been refusing to take the necessary medications prescribed for him, and this refusal has led to the present motion.  Although defendant's counsel has opposed the forced medication of defendant, counsel acknowledges that it is not likely that defendant will be restored to competence without medication.  Defendant's Response, July 29, 2011, at 10.

The court held a hearing on the present motion on August 3, 2011.  In addition to reviewing the 20-page evaluation prepared at Butner, the court heard live testimony (by video teleconferencing) from the three co-authors of the report – Dr. Maureen Reardon, a psychologist, Dr. Sarah A. Ralson, a psychiatrist, and Natalie Anumba, M.S., a Ph.D candidate.

## Findings and Analysis

After consideration of all the evidence of record, along with the submissions of the parties, the court finds the following to be established by clear and convincing evidence in regard to plaintiff's condition:

Defendant is suffering from Delusional Disorder, as found by the three evaluators at FMC Butner and the psychologist at MCC in Chicago.  Defendant espouses fixed beliefs, that among other things he has uncovered an elaborate conspiracy involving the theft by a member of one of the nation's most prominent political families, whom he identifies, of gold bars valued at $800 billion dollars from Fort Knox.  Defendant believes this man was responsible for most of the

world's major calamities during the past 70 years, including World War II; that it is defendant's personal mission to find the gold bars and provide information to the government that would save the U.S. Economy; that aliens had landed their spacecraft in his yard having come to Earth to search for the element Boron; that defendant is an exceptional individual with unique knowledge, and has direct affiliations with government agencies, and special relationships with prominent figures such as a United States Senator from Michigan and President Obama. This system of "distorted belief" has been present for at least the past decade and a half. The delusional disorder is classified as "Mixed Type" with two different types of delusions, prersecutory and grandiose, neither of them predominating.

Stephenson's delusional disorder significantly interferes with his rational and factual understanding of the current legal proceedings and his ability to assist counsel in his defenses. The court concurs with the three examiners at Butner, and Dr. Niederding at the MCC, who all view defendant as not competent to stand trial

The primary treatment of Delusional Disorder involves anti-psychotic medication, which can produce beneficial clinical effects such as reducing the intensity and preoccupation with delusional ideation. The prescription of anti-psychotic medication is commonly used by the psychiatric community as a standard component of treatment for someone with Mr. Stephenson's mental illness.

Defendant's psychotic symptoms have shown no improvement over the course of his illness. His condition is considered chronic and unlikely to improve in the foreseeable future without treatment with anti-psychotic medication. In view of defendant's current psychosis, it is considered a necessary treatment at this time to restore him to competency.

4

There is a substantial likelihood that with appropriate treatment with psychotropic medications, defendant may be able to improve to such an extent that his competency to proceed may be restored.  Defendant's symptoms have improved in the past with psychotropic medication.

In the absence of medication, the prognosis for improvement of his condition is very poor.

Defendant does not believe he suffers from mental illness, and refuses treatment with psychotropic medications.  He considers psychotropic drugs to be poison.  He believes that the last time they were used they left a "black ball" in his brain.   Due to the severity of his symptoms, he lacks insight into his illness and his need for treatment.

Defendant will likely require involuntary administration of anti-psychotic medication since he has refused to provide consent for medication or to submit to voluntary administration of an oral anti-psychotic, nor would it be practical to administer a short-acting injectable medication on a daily basis.  For these reasons, the medical authorities at Butner would rely on a long-acting injectable psychotic medication.

According to the medical personnel at Butner, the three options for medicating defendant include Risperdal Consta; Prolixin Decanoate; and Haldol-Decanote.  Each could be expected to effectively restore defendant's competence to stand trial and "attenuating his psychotic symptoms."  The expected efficacy of Mr. Stephenson would be expected to be in the neighborhood of above 70%.  It is not practical to administer a short-acting injectable medication on a daily basis, and for this reason, Butner would rely on a long-acting injectable anti-psychotic medication. These are all long-acting medications, but a test dose of the short-acting formulation would be required for safety purposes to rule out unexpected allergic reactions.

5

Butner would start with Risperdal Consta because it believes this drug was tolerated in the past. Risperdal is a second generation anti-psychotic drug. It impedes transmission of Dopamine and results in delusions being less firmly held. Risperdal is taken orally, while Risperdal Consta is a slow acting injection which slowly releases over a two-week period. It is the intention of FMC Butner to institute a trial of Risperdal Consta, which can be administered in a dosage range from 25 mg. to 100 mg. every two weeks, because Mr. Stephenson previously treated with oral Risperdal without experiencing adverse effects, according to their evaluation. However, they also acknowledged upon questioning that the defendant's use of Risperdal had been discontinued after only a few days without explanation. Risperdal injections every two weeks would be less likely to cause interruptions in its administration. Risperdal Consta is an FDA-approved drug with a 75% to 85% success rate. The protocol at Butner would place defendant on Risperdal Consta for six weeks. If there was some improvement, they would extend the period to twelve weeks. Otherwise they would consider changing to Prolixlin or Haldol.

Risperdal carries with it the possibility of side effects. The most significant potential side effect is tardive dyskinesia, because it is the only side effect that is not reversible with the discontinuation of the medication. Tardive dyskinesia is a serious condition. It consists of involuntary motor movements most commonly around the perioral region (relating to tissues around the mouth) which may never go away. The first stages are subtle, and the risk increases as dosage increases; but it can arise even from brief low doses. Unfortunately, there is no effective treatment for tardive dyskinesia. The FMC considers the onset of tardive dyskinesia an "almost" negligible risk.

Other side effects of Risperdal Consta can be hyperglycemia, hypelipidemia and elevated prolactin, in addition to an expected weight gain of ten pounds.

Hyperglycemia occurs in a "significant minority" of patients treated with Risperdal. Butner report at 16. Although it rarely happens, hyperglycemia can result in diabetes or become life threatening. (There is admittedly less risk of hyperglycemia occurring with Geodon or Abilify, but those are only available in oral forms and so not feasible for forced medication.) The staff at Butner would monitor defendant with fasting blood sugars at three month intervals and regular clinical monitoring to watch for signs and symptoms of hyperglycemia. Hyperglycemia is supposed to be reversible with the discontinuation of the Resperdal.

Another possible side effect of Risperdal is hyperlipidemia. Hyperlipidemia, defined as an elevation of triglycerides and low density lipoprotein (LDL) with the lowering of his high density lipoprotein (HDL), also occurs in a "significant minority" of patients treated with Risperdal. If defendant developed Hyperlipidemia, the only practical options for management would be to shift to the typical anti-psychotics such as Prolixin or Haldol. Mr. Stephenson has very mild abnormalities of only triglycerides and HDL at baseline, and these would be monitored closely for any changes. (There are other options such as switching to an atypical oral anti-psychotic with a lower risk of this side effect such as either Geodon or Abilify; or lifestyle changes such as diet and exercise; or referral to medical services for treatment with lipid lowering medication, but again these would not appear to be feasible with a non-consenting patient). *Id.* at 16-17.

Elevated prolactin is another side effect of Risperdal occurring in a "significant minority" of patients treated with Risperdal. In Mr. Stephenson's case, this finding would not be clinically significant according to Butner.

7

The medical authorities are FMC Butner are looking at Risperdal simply because the alternatives such as Geodon, Abilify, Seroquel and Zyprexa do not offer the flexibility of a long-acting injection.  The Butner report states at 17 that if defendant was "to have a sub-optimal response to Risperdal Consta after a therapeutic trial of approximately six months, or if he were to develop *unremitting* side effects such as hyperlipidemia, hyperglycemia or *uncontrollable* weight gain, then Prolixin Decanoate or Haldol Decanoate would be considered," with Haldol being preferable due to its four-week dosing interval as opposed to two weeks for Prolixin.  (Emphasis added).  Unlike Risperdol, a second generation drug, these two alternatives are first generation.

The most notable side effects of Haldol and Prolixin are movement disorders, including Parkinsonian effects, dystonic reactions, akathisia and tardive dyskinesia.  With the exception of the latter, these side effects are reversible with a discontinuation of the medication.  Parkinsonian effects are the most common, occurring in approximately 15% of patients, usually in 5 to 90 days of the initiation.  Symptoms include muscle stiffness, cogwheel rigidity, shuffling gait, stooped posture, and a coarse tremor.  If Stephenson were to develop this side effect, he would be administered Cogentin 2 mg up to every eight hours as needed which usually provides immediate relief for these symptoms.  *Id.* at 17.  Drugs administered to treat side effects can sometimes have their own side effects.  Side effects of Cogentin are dry mouth, blurred vision, dizziness and constipation, and chronic administration of Cogentin may increase the risk of tardive dyskinesia.  *Id.* at 18.

Approximately 10% of the patients treated with either Haldol or Prolixin experience dystonic reactions within a few hours or days of the initiation of treatment.  Dystonic reactions

consist of a slow, sustained muscular contraction or spasm, that can result in an involuntary movement involving the neck, jaw, tongue, or the entire body. *Id.*

   Akathisia, another movement disorder that can occur with Haldol or Prolixin, is a subjective feeling of muscular discomfort that can cause the patient to be agitated, pace, sit and stand and feel dysphoric.  This is a side effect that can occur at any time during the treatment and is less frequent than Parkinsonism or dystonic reaction, but may be under diagnosed as psychosis, agitation or poor cooperation.  If Stephenson were to develop Akathisia, the Haldol or Prolixin would be reduced with a possible temporary addition of Inderal or Ativan.  Inderal, in turn, may cause dizziness, bradycardia and dysphoria. Ativan may result in sedation and unsteadiness.  *Id.*

   The side effect of tardive dyskinesia is, again, most serious due to possible irreversibility and incapacitation.  This is a delayed effect of the typical anti-psychotics such as Haldol and Prolixin rarely occurring until after six months of treatment, but then occurring at an incident of 4% per year with a lifetime prevalence of approximately 30%.  The longer a patient is on the typical anti-psychotic, the most likely the patient is to develop this side effect, which may not be dose related.  Symptoms consists of involuntary, irregular combinations of writhing and jerking movements of the voluntary muscles of the head, limbs and/or trunk but most commonly occurring periorally.  The severity of these movements ranges from minimal to grossly incapacitating.  The approach to tardive dyskinesia is prevention, diagnosis and management. Early intervention is imperative and discontinuation of the anti-psychotic drug at the first signs of tardive dyskinesia results in the reversal of tardive dyskinesia is 50% of the cases.  The only established treatment for intractable tardive dyskinesia is discontinuation of the offending anti-psychotic and switching to the atypical anti-psychotic, Clozaril.  However, Mr. Stephenson would be unlikely to comply with this

latter treatment which would additionally require extensive notification of the court for authorization. *Id.* at 18-19.

The proposed treatment, in the opinion of the Butner examiners, would be substantially unlikely to have side effects that would interfere significantly with defendant's ability to assist counsel in conducting a defense, if there were "appropriate clinical management to minimize any of these side effects," *id.* at 19, although this is not so clear if defendant were to develop Akathisia which might cause him to become agitated and uncooperative.  It is also not clear who would manage these side effects once defendant was away from Butner.  Defendant would have to maintain his medications to stay competent.  Even a long-term medication will have to continue to be administered to defendant, with the attendant  monitoring, after his return for trial.  At least while defendant remains at Butner,  medical personnel at that facility would attempt to minimize any side effects by monitoring the defendant and making dosage changes and administering adjunctive medication as needed.

The side effects for Haldol and Prolixin as discussed above would be unlikely to interfere with Mr. Stephenson's ability to assist his counsel in his defense, if there were appropriate clinical management to minimize any of these side effects.

Alternatively, less intrusive treatments than involuntary medication are unlikely to achieve the same results.  Without medication, defendant is not receptive to counseling; he is not able to effectively participate in back and forth discussions.

Defendant can presently perform basic tasks for day-to-day living at Butner.

A complete physical of defendant was performed on March 10, 2011.  He is 64.

10

He has no serious medical conditions. He has no medical conditions which would be adversely effected by this course of treatment.

Stephenson is currently not on any medication.

Stephenson denies any suicidal or homicidal ideation or intent. Defendant is not currently a danger to himself or others, or gravely disabled as a result of his mental illness, while within the confines of his custodial environment.  No opinion has been proffered by the authorities as to whether he would be a danger to himself or others if he were not in a custodial environment.

The parties concur that the question of whether involuntary medication violates the defendant's constitutional rights is controlled by the Supreme Court's decision in *United States v. Sell,* 539 U.S. 166 (2003), in which the Court concluded that the Constitution permits the Government, in limited circumstances, to involuntarily administer anti-psychotic drugs to a mentally ill criminal defendant, in order to render the defendant competent to stand trial for serious but nonviolent crimes.  The *Sell* court observed that "involuntary medical treatment raises questions of clear constitutional importance," *id.* at 176 [citing among other cases *Winston v. Lee,* 470 U.S. 753, 759 (1985) ("a compelled surgical intrusion into an individual's body . . . implicates expectations of privacy and security" of great magnitude)] , and described the conditions that must be satisfied before it can be done.

Two Supreme Court decisions presaging *Sell* were *Washington v. Harper*, 494 U.S. 210 (1990) and *Riggins* v. *Nevada*, 504 U.S.127 (1992).  In *Harper*, the Supreme Court recognized that a prison inmate with a serious mental illness has a constitutionally-protected liberty interest in avoiding the unwanted administration of anti-psychotic drugs.  But it held that if it is in the inmate's medical interest, the due process clause permits the state to treat an inmate with anti-psychotic drugs

11

against his will, **"to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others."**  *Harper*, 494 U.S. at 236 (emphasis added).

Two years later in *Riggins,* 504 U.S. 127,

> "the Court repeated that an individual has a constitutionally protected  liberty 'interest in avoiding involuntary administration of antipsychotic drugs"- an interest that **only an 'essential' or 'overriding' state  interest** might overcome.  504 U.S., at 134, 135.   The Court suggested that, in principle, forced medication in order to render a defendant competent to stand trial **for murder** was constitutionally permissible."

*Sell*, 539 U.S. at 178-9 (emphasis added).

Building on *Harper* and *Riggins* , the Court in Sell concluded that the Constitution permits the government involuntarily to administer anti-psychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of lesser intrusive alternatives, is significantly necessary to further important governmental trial-related interests.  *Sell*, 539 at 179. The *Sell* court observed that "[t]his standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances.  **But those instances may be rare**.  That is because the standard says or fairly implies," *id.* at 180 (emphasis added), "that a court must find that *important* governmental interests are at stake." *Id.* (emphasis in original).  All of this would suggest that where the only reason for involuntarily medicating a defendant is to make his competent to stand trial, more is required than simply that a felony charge is pending.

Before this court may authorize the involuntary administration of anti-psychotic medication for the purpose of rendering Stephenson competent to stand trial, the government must show: (1) important government interests are at stake; (2) involuntary medication is substantially

likely to render the defendant competent to stand trial and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel at trial; (3) involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results; and (4) the administration of the drugs is medically appropriate. *Id.* 180-182.

Counsel for the government has acknowledged that the burden on the government to make this showing is by clear and convincing evidence. *United States. Payne,* 539 F.3d 505, 509 (6th Cir. 2008)(quoting *United States v. Green,* 532 F.3d 538, 545 (6th Cir. 2008); *see also, United States. v. Gomes,* 387 F.3d 157, 160 (6th Cir. 2004).

The first *Sell* factor is whether a crime is sufficiently serious to represent an important government interest. On its face, any offense that carries a maximum penalty of ten years can be said to be serious. *See, United States v. Evans,* 404 F.3d 227 (4th Cir. 2005) (maximum statutory penalty of ten years warrants finding that crime is serious enough to constitute an important government interest). However, for purposes of the *Sell* analysis, this term is a relative one to be considered in light of the facts of the individual case. *Sell*, 539 U.S. at 180. The fact that a crime is 'serious' is just the starting point.

While the present offense is certainly defined as a 'serious' one, it is not the same as an offense that, for example, carries a *minimum* ten-year sentence or a maximum life sentence. Nor was it a crime that was carried out in a violent manner or involved any harm to persons or property. It is difficult to find the that the crime charged here could be said to reflect an 'essential' or 'overriding' state interest. It is certainly not equivalent to murder.

13

Moreover, the courts are counseled to consider whether there any "special circumstances may lessen the importance" of the government's interest in prosecution.

> "The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill-and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime."

*Id*. Here, Stephenson's persistent refusal to take anti-psychotic medications, which would reduce his delusions to a manageable state, may preclude his release from his safe custodial status to the uncertainties of the outside world, for a long time. Defendant poses no danger to other persons while in his custodial environment, but according to the Butner authorities, an entirely separate determination will have to be made before he is released from his custodial environment. If the government can make an argument at that time that his 15-year-old conviction for being an accessory after the fact to a homicide, and his nebulous ties to a rogue militia group make him a danger to the public, he will presumably remain in a civil commitment posture until such time as he chooses to take the recommended anti-psychotic medication. On the other hand, if a court were to subsequently release him from a custodial environment because it determined that defendant was not a danger to the public, much of the government's concern about him would presumably be alleviated.

Another special circumstance that may be considered in determining the government's interest is "where a defendant suffer[s] from a severe mental illness both at the time of the alleged crime and the time of the hearing, [such that] the government interest in prosecuting . . .[is] not sufficient to merit involuntary medication" because a verdict of "not guilty by reason of insanity" would be likely to result. *United States v. Walton,* No. 08-20599-BC, 2009 WL 3562507 at * 2 (E.D. Mich. Oct. 28, 2009), quoting *United States v. Sheets*, No. 3:07-cr-68, 2008 WL

14

4614330 at *3 (E.D. Tenn. Oct. 15, 2008).  In the present case, the issue of mental responsibility at the time of the incident appears to be a close one. The date of the alleged offense was June 18, 2010, the month preceding defendant's arrest.  The only examination so far addressing the issue of criminal responsibility was performed at the court's direction at the MCC.  While not yet admitted into evidence it will reflect that defendant was clearly experiencing symptoms of a serious mental disease or defect at the time of the alleged offense, Delusional Disorder, Grandiose type, and that "[h]is delusional thoughts likely interfered with his ability to appreciate the wrongfulness of his behavior," but that he "could appreciate the nature and quality of his actions."  Thus, defendant might well be found not responsible at the time of the offense.

The potential for future confinement can affect the strength of the need for prosecution.  *Sell*, 539 U.S. at 180.  Defendant has been incarcerated for over thirteen months already, for which he should receive credit toward any sentence.  It could be another six months or more before he is restored to competency (assuming his competency is restored) and then he must be returned for trial.  Sentencing could take another three to four months.  Thus, even if his defense of a lack of mental responsibility was rejected and he was found guilty, there might be little prison time left to serve for this defendant.

I find that while the government has an interest in bringing defendant to trial, this is not one of those instances alluded to be the Supreme Court which is so rare or essential to the state as to override Stephenson's liberty interest in not being forcibly medicated.  This is discussed further in the fourth consideration, *infra.*

The second *Sell* consideration is whether the government has shown that the involuntary medication will significantly further its interest.  The court must find that the

15

administration of the drugs is substantially likely to render the defendant competent to stand trial. *Sell*, 539 U.S. at 181. The use of anti-psychotic drugs is the primary method of treating Delusional Disorder. Twice before the use of anti-psychotic drugs have restored this particular patient when he had been incompetent for court proceedings. The FMC estimates there is a 70% chance the same can be accomplished this time. Based on all of this, I find the government has met its burden here.

The government must also show as part of the second consideration that this same administration of drugs "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, . . ." *Id.* This is a narrow question. It only considers the impact side effects may have on a defendant's ability to assist his attorney at trial, not the impact of side effects generally. The FMC's report concludes any side effects will not impair the defendant's ability to assist his lawyer. Here the key word is "substantially." If defendant experienced akathisia, and/or tardive dyskinesia, I believe it could impair his ability to assist his attorney and might well adversely affect his appearance in front of a jury. However, since these side effects are not statistically likely to occur, they are not by themselves sufficient to derail the government's motion. I think the government has still shown by clear and convincing evidence that defendant is "substantially unlikely" to have side effects which will impact his right to a fair trial. That is not to say, however, that the possibility of these side effects can be disregarded, as is more fully discussed below.

Third, the court must conclude that the involuntary medication is necessary to further the government's interest in having a trial, and find that there are no alternative, less intrusive treatments available likely to achieve substantially the same results. *Id.* at 181. Here the parties and the court agree. Defendant's serious mental illness will not be overcome in the absence of

16

medication.  His delusions are so strong that when he is in his delusional world he is literally consumed by his false belief system and he cannot engage in the type of give-and-take dialogue necessary for counseling. Only medication can reduce the strength of those delusions to the point defendant's mind will be open to other ideas.  Upon inquiry, the FMC doctors testified  that the threat of contempt would also be meaningless.

And since defendant refuses to take medications voluntarily, believing he is not mentally ill and therefore not in need of them, and that they are poison, the medications can only be administered involuntarily.

Fourth, the court must find that it is "in the patient's best medical interest in light of his medical condition" to be given this medication against his will.  *Sell,* 539 U.S. at 181.  In this regard, I do not find that the government has established by clear and convincing evidence - a very high standard - that the forced medication of this defendant is medically appropriate.  The defendant has a liberty interest protected by the Constitution to not be forced to take psychotropic drugs he does not want in his body.  While that right may be overridden, the Supreme Court has suggested in *Sell* that the instances where this would be appropriate solely to make a person competent to appear in a courtroom would be  rare.  This defendant is neither a danger to himself nor others in his present custodial environment, nor does his refusal to take drugs put his own health gravely at risk - all reasons that might trump his liberty interest.  So, could defendant benefit from these drugs?  Yes.  There is a 70% chance he would regain his competency to stand trial.  Could he suffer from adverse side effects?  The odds are much less but not inconsequential, since these side effects, such as involuntary muscular movements, could be irreversible.   It is easy to recommend that we roll the dice since the odds favor a good outcome, and of course the chance for a fair trial, but if the wrong

17

result occurs it is not the doctors or attorneys or courts that pay the price.  It is the defendant.  This is why he has a liberty interest, and why the test is not simply, "Could he benefit?"

Weighed against the defendant's liberty in his bodily integrity is the government's interest in bringing defendant to trial.  Under the circumstances, however, this interest is not as compelling as it might be.  Defendant is 64.  He is charged with a Class C felony.  He poses no danger to others or to himself at the moment.  He may never be convicted if it is determined that he was not mentally responsible at the time of the offense because of his delusional disorder.  Defendant has already been incarcerated for over a year on this charge, as noted.  He presumably could spend some time in prison and on supervised release, but during both he would  have to remain on his medications and be monitored by someone.  There is no guarantee he will not suffer irreversible muscular disorders from the anti-psychotic drugs.  Based on this past performance (he went off his medications in 2007) and his attitude to date, defendant would probably not remain on those  medications voluntarily, thus bringing us full circle.

A final point.  The government submits that because an order to involuntarily medicate the defendant "will conclusively determine a disputed question of constitutional importance, namely whether Defendant has a right to avoid forced medication," the "prudent course in this case" would be  for the undersigned to proceed by report and recommendation.  Government's Brief at 1,7.

I do not believe this is necessary.  Section 636(b)(1)(A) of Title 28 permits the district court to designate any pretrial matter to the determination of the magistrate judge, with the exception of eight types of motions which on their face are not applicable here.  Further, § 636(b)(3) permits

a district judge to assign to the magistrate judge any additional duties not inconsistent with the Constitution and laws of the United States.

The list of eight motions excepted from § 636(b)(1)(A), while not considered exhaustive, creates parameters by which Congress intended to limit the authority of magistrate judges.  These are often referred to as 'dispositive' motions, to differentiate them from 'non-dispositive' matters  routinely occurring in pretrial proceedings.  However, the distinction is not based on whether a constitutional issue is involved, as suggested by the Government's brief.  After all, magistrate judges routinely make decisions in criminal cases impacting a defendant's constitutional rights, in situations which do not decide the case.  For example, magistrate judges determine whether there is probable cause to issue search warrants and arrest warrants, or whether probable cause has been presented at a preliminary hearing; they determine whether to detain a defendant, appoint him counsel, or allow him to waive his right to a grand jury; etc.  All of these and more are adjudications of a criminal defendant's constitutional rights in a pretrial setting.  (In fact, magistrate judges also handle constitutional issues which may decide the case, when it is an petty offense or, with consent, a Class A misdemeanor.)

There is no doubt that the issue of whether to involuntarily medicate Stephenson "raises questions of clear constitutional importance."  *Sell* at 176.  It is equally certain, according to *Sell*, that  "the basic issue – whether Sell [Stephenson] must undergo medication against his will – is 'completely separate from the merits of the action,' . . . i.e., whether Sell [Stephenson] is guilty or innocent of the crimes charged."  *Id.*  Moreover, not only does the court's resolution of whether to involuntarily medicate the defendant not decide the merits of the case, it is also "wholly separate as well from questions concerning trial procedures."  *Id.*

19

Thus, in determining whether a magistrate judge may decide whether to involuntarily medicate the defendant, or whether this issue should be construed as an exception to § 636(b)(1)(A), the best guidance is the Supreme Court's decision in *Sell* itself.

In *Sell*, the Supreme Court, since it was determining its own jurisdiction to hear the appeal, laid out the procedural history of the case in some detail. It specifically discussed the role played by the magistrate judge. It noted that the magistrate judge had been delegated authority to conduct pretrial proceedings pursuant to an order from the district court, per § 636(b)(1)(A). *Sell,* 539 at 175. The magistrate judge entered an order to involuntarily medicate the defendant, who was charged with attempted murder, to render the defendant competent to stand trial and because he was dangerous. *Sell*, 539 U.S. at 173-74. The magistrate judge stayed the order, to allow Sell to appeal to the district judge. The district judge affirmed the magistrate judge in part and reversed in part, finding Sell was not dangerous. In reversing the magistrate judge, the district judge applied the "clearly erroneous" standard found in § 636(b)(1)(A). *Id.* at 173-74, 184. As in *Sell,* the parties can appeal the decision in the present action to the district judge assigned to the case.

The Eighth Circuit Court of Appeals affirmed the district court in *United States v. Sell*, 282 F.3d 560 (2002). *Id.* at 174.

The Supreme Court reversed the Eighth Circuit. The Supreme Court did not question the appropriateness of the magistrate issuing the medication order in the first instance. Rather, it cited the findings in the magistrate judge's opinion to support its own conclusion that the appellate court had not applied the correct tests in approving the forced medication of the defendant.

The government relies on a subsequent case from the Ninth Circuit, *United States v. Rivera-Guerrero*, 377 F.3d 1064 (2004), which held that magistrate judges lack the authority to issue

20

final orders authorizing the involuntary administration of medication. This holding is inconsistent with the proceedings in the *Sell* case. The Ninth Circuit explained away this inconsistency by saying that since the question of a magistrate judge's authority had not been "brought to the attention" of the Supreme Court, nor ruled upon, in *Sell*, the high court's review of the magistrate judge's order in that case "[did] not alter [the Ninth Circuit's] analysis." *Id.* at 1071. While it is correct to say that the Supreme Court did not specifically rule on this point (and apparently no other circuit court has either), this argument, with all due respect to the Government, is not as persuasive as it might be (nor is it binding on this court). The Supreme Court is well aware of the role of magistrate judges in the federal judicial hierarchy, and the statute governing them. And it has not hesitated to limit their authority in the past, as the Ninth Circuit's opinion observes. Nor has the Supreme Court been inhibited in alluding to issues that parties could have been pursued in the courts below, and then put before the Supreme Court, but failed to do so. (*Sell* itself provides such an example. The Court observed at 539 U.S. 184:

> "We shall assume that the Court of Appeals' conclusion about Sell's dangerousness was correct. But we make that assumption *only* because the Government did not contest, and the parties have not argued, that particular matter. If anything, the record before us, described in Part I, suggests the contrary."

(Emphasis in original))

Here, the Supreme Court apparently felt no discomfort with a magistrate judge issuing an involuntary medication order in a pretrial proceeding, that was then reviewed by a district judge and a court of appeals. The present case procedurally tracks the *Sell* case. This decision attempts to apply the correct tests spelled out in *Sell.* Whether this has been done properly, of

21

course, is subject to appeal to the district judge, just as in *Sell.*  And just as in *Sell,* the final decision of this court, appealable to the court of appeals, will be from the district judge.

### Conclusion

The government has not shown by clear and convincing evidence that its singular interest in rendering defendant competent to stand trial outweighs Stephenson's liberty interest in not being forcibly injected with psychotropic medications and possibly suffering the risks attendant to those drugs.

The motion will be **DENIED.**

Dated:  August 23, 2011                                       /s/ Hugh W. Brenneman, Jr.
                                                             HUGH W. BRENNEMAN, JR.
                                                             United States Magistrate Judge